UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: FICO ANTITRUST LITIGATION | ) | |
| RELATED CASES | ) | |
| | ) | No. 1:20-CV-02114 |
| | ) | |
| | ) | Judge Edmond E. Chang |
| This document relates to: | ) | |
| | ) | |
| ALL ACTIONS | ) | |

MEMORANDUM OPINION AND ORDER

These antitrust class actions allege that Fair Isaac Company (better known in the industry and to consumers as FICO) and the three major credit bureaus: TransUnion, Equifax, and Experian (collectively called the Credit Bureaus for convenience's sake) engaged in monopolistic behavior that caused the Plaintiffs to overpay for FICO credit scores in violation of the Sherman Act, 15 U.S.C. §§ 1, 2 (and pertinent accompanying provisions of the Clayton Act, 15 U.S.C. §§ 15, 26), and various state laws.[1] There are two categories of plaintiffs, and they have filed separate complaints: (1) entities like Sky Federal Credit Union (grouped together as the Direct Purchasers) allege that they bought credit scores from FICO through agreements with FICO and the Credit Bureaus, R. 121, Direct Purchaser Consol. Compl. (DPCC) ¶¶ 15–21;[2] and (2) entities like Garner Properties & Management LLC (grouped

---

[1]The Court has subject matter jurisdiction over Sherman Act and Clayton Act claims under 28 U.S.C. § 1331, and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

[2]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

together as the Indirect Purchasers) allege that they bought FICO scores not from FICO or a Credit Bureau, but from some intermediary company, R. 122, Indirect Purchaser Am. Compl. (IPAC) ¶¶ 21–22. The Credit Bureaus and FICO filed separate motions to dismiss both Complaints. *See* R. 135, CB Mot.; R. 138, FICO Mot. For the reasons discussed in this Opinion, the Court grants the motion filed by the Credit Bureaus and grants in part and denies in part the motion filed by FICO.

## I. Background

Both Complaints allege that FICO overcharged for credit scores. A credit score is a three-digit number, typically between 300 and 850, that is supposed to convey the creditworthiness of a consumer based on his or her credit history. DPCC ¶¶ 1, 34–35; IPAC ¶ 1, 35–36. Consumers can buy information on their own credit scores to monitor their own creditworthiness; the market for these scores is called the business-to-consumer market. *Id.* But the cases now before the Court are concerned with the so-called B2B market, or business-to-business market, in which businesses buy consumers' credit scores to assess the risk of extending credit or engaging in transactions with those consumers. DPCC ¶¶ 2, 40, 42; IPAC ¶¶ 1, 3, 46.

FICO has allegedly maintained a 90% monopoly (that is, 90% of top lenders rely on FICO) over the B2B credit-score market for many years. DPCC ¶¶ 2, 63; IPAC ¶¶ 2, 77. The Plaintiffs allege that FICO has been aided by the three main Credit Bureaus—Experian, Equifax, and TransUnion—which collect, standardize, and distribute the credit and financial history of individuals through credit reports. DPCC ¶¶ 3, 38–40, 56; IPAC ¶¶ 3–5, 39–41. Together, the Credit Bureaus control nearly

2

100% of the aggregate credit-related data formed by aggregating credit data collected from businesses. DPCC ¶ 3; IPAC ¶ 3. The Credit Bureaus allegedly acted as FICO's agents and co-conspirators in negotiating sales of credit scores to businesses on terms that favor FICO, then distributed FICO Scores to businesses. DPCC ¶¶ 4, 8, 35, 42; IPAC ¶¶ 6, 12, 46.

In 2006, the Credit Bureaus launched VantageScore—an intended competitor to FICO Scores. DPCC ¶ 6; IPAC ¶ 10. Like FICO Scores, VantageScore employed scoring codes and algorithms to translate consumer information into a credit score. *Id.* VantageScore distinguished itself through its competitive pricing and ability to provide a credit score for millions of people that would otherwise be unable to access one. DPCC ¶¶ 6–7, 79–82; IPAC ¶¶ 11, 90. That same year, FICO filed a lawsuit against the Credit Bureaus and VantageScore "with the intended purpose of driving VantageScore Solutions out of business." DPCC ¶¶ 9, 88; IPAC ¶¶ 103–104. FICO alleged antitrust, trademark, false advertising, and trade secret claims. *See generally Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139 (8th Cir. 2011). Specifically, FICO argued that VantageScore infringed on FICO's trademark over credit score numbers in the range of 300–850 (VantageScore used a 501–900 scale). *Id.* at 1147. In 2011, the Eighth Circuit ultimately affirmed a jury verdict against FICO. *Id.* at 1152–53.

Between 2013 and 2015, FICO renewed its licensing and distribution agreements with the Credit Bureaus. FICO entered into a new contract with Experian in May 2013, Equifax in October 2013, and TransUnion in February 2015. DPCC ¶ 105;

IPAC ¶ 122. The Plaintiffs allege that these agreements contained anticompetitive clauses that prevented the Credit Bureaus from marketing non-FICO credit scores and allowed FICO to penalize customers that sought both a FICO Score and a VantageScore. DPCC ¶¶ 10, 108; IPAC ¶¶ 14, 125. According to the Plaintiffs, the Credit Bureaus accepted these provisions—even though the requirements would harm their own joint venture—on a *quid pro quo* basis, that is, the Credit Bureaus in turn received a beneficial clause in the agreements that would prevent competition amongst the Credit Bureaus. DPCC ¶¶ 102, 18, 124–27; IPAC ¶¶ 119, 125, 145–49. The allegedly anticompetitive provisions and the bureau-benefitting clause are described in further detail next.

**No Equivalent Products.** The No Equivalent Products clause prohibits the Credit Bureaus from developing or distributing a non-FICO analytic "that is 'aligned to the odds-to-score relationship of any Fair Isaac Analytic' or uses more than a limited number of reason codes that 'match' reason codes used by any Fair Isaac Analytic." DPCC ¶¶ 107, 109–10; IPAC ¶¶ 124, 126–27. The odds-to-score relationship describes the relationship between a numerical score and the risk that a consumer will default on a particular loan. DPCC ¶ 111; IPAC ¶ 130. "Reason codes" describe the rationale for why a score is not higher. *See* DPCC ¶¶ 36–37; IPAC ¶¶ 37–38.

**Dynamic Royalty Schedule.** The Dynamic Royalty Schedule clause allows FICO to control the pricing of FICO Scores through the royalties that FICO charges the Credit Bureaus. DPCC ¶ 116; IPAC ¶ 136. According to TransUnion, FICO "abused and exploited" this provision by establishing new contract terms and royalty

categories. DPCC ¶ 117; IPAC ¶ 137. For example, FICO implemented a "Pre-Quali-fication" royalty category in 2015. DPCC¶ 118; IPAC ¶ 138. This category imposed a seven times penalty rate on lenders that purchased a FICO score for use in "Pre-Qualification" along with VantageScore (or any other credit score). DPCC ¶ 119; IPAC ¶ 140. The Plaintiffs allege that this penalty was intended to prevent, and did in fact prevent, lenders from relying on additional or alternative credit scores such as VantageScores. DPCC ¶¶ 119, 123; IPAC ¶¶ 140, 144.

*Level Playing Field.* The Plaintiffs allege that, in exchange for the Credit Bureaus adopting the two clauses above, FICO provided a Level Playing Field clause that benefitted the Credit Bureaus. DPCC ¶¶ 108, 124; IPAC ¶ 145. This provision prevents FICO from offering any Credit Bureau a more favorable price for distrib-uting FICO Scores than that offered to any other Credit Bureau. *Id.* Because the Level Playing Field clause effectively prevents any fluctuations in the price of FICO Scores for the Credit Bureaus, the Plaintiffs allege the incentive that FICO could otherwise offer (more favorable pricing) to entice a new credit bureau to enter the market is eliminated. DPCC ¶¶ 125–127; IPAC ¶¶ 146, 147, 151.

In November 2017, FICO brought suit against TransUnion, alleging that TransUnion underpaid royalties, committed copyright infringement and conversion, breached several written agreements, and committed false advertising related to VantageScore. *Fair Isaac Corp. v. TransUnion, LLC* (*TransUnion I*), 2019 WL 1436018, at *1 (N.D. Ill. Mar. 30, 2019). In January 2018, TransUnion filed counter-claims against FICO, alleging that FICO violated Section 2 of the Sherman Act. *See*

5

R. 38, TransUnion LLC's Redacted Counterclaims, *Fair Isaac Corp. v. TransUnion LLC*, No. 1:17-cv-08318 (N.D. Ill. filed Feb. 12, 2018) ("TransUnion Counterclaims"). The district court held that TransUnion "adequately pled actual and attempted monopolization. *Fair Isacc Corp. v. TransUnion, LLC* (*TransUnion* II), 2019 WL 1382068, at *2 (N.D. Ill. Mar. 27, 2019). Specifically, TransUnion "puts forth claims that, if proven, could establish that FICO's exclusive dealing provisions are unlawful attempts to maintain monopoly power through exclusionary conduct." *Id.* (cleaned up).[3] The parties ultimately settled on undisclosed terms, with TransUnion entering into a long-term contract with FICO to distribute FICO Scores. DPCC ¶ 99*;* IPAC ¶ 114.

During the pendency of the *TransUnion* litigation, in April 2020, Sky Federal Credit Union filed a class-action complaint against FICO. R. 1. Nine other complaints against FICO soon followed, asserting federal and state antitrust claims. *See In re FICO Antitrust Litig. Related Cases*, 2021 WL 4478042, at *1 (N.D. Ill. Sept. 30, 2021). In September 2021, this Court addressed how the 10 related cases should be consolidated and how the Plaintiffs should be apportioned. *Id.* at *3. The Court appointed Scott+Scott as Interim Class Counsel representing the consolidated Direct Purchaser Action, and also appointed Cohen Milstein Sellers & Toll PLLC as Interim

---

[3]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

Class Counsel representing the Indirect Purchaser Action. *Id.* at *6. A description of these plaintiff categories follows:

*Direct Purchaser Plaintiffs.* Direct Purchasers are entities that directly purchased B2B credit scores from FICO and one or more Credit Bureaus, submitting payment to FICO, to the Credit Bureaus, or to both. DPCC ¶¶ 15–21, 42; *see In re FICO,* 2021 WL 4478042, at *2.

*Indirect Purchaser Plaintiffs.* Indirect Purchasers are entities that bought FICO scores not from FICO or a Credit Bureau, but from an intermediary group. For example, Garner Properties & Management LLC, a named Indirect Purchaser Plaintiff, is a real estate brokerage and property management company that buys FICO scores from third-parties, which in turn buy the scores from the Credit Bureaus. IPAC ¶¶ 21–23; *see In re FICO,* 2021 WL 4478042, at *2.

In December 2021, the Direct Purchasers filed their consolidated class action complaint. DPCC. That same month, the Indirect Purchasers filed their amended class action complaint. IPAC.

## II. Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended

7

to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678–79.

### III. Analysis

### A. Monopolization

The Plaintiffs allege that FICO violated Section 2 of the Sherman Act "by maintaining its monopoly in the B2B Credit Score Market through anticompetitive agreements, meritless litigation, and false statements." R. 147, Pls.' Resp. at 14; *see* DPCC ¶¶ 239–253 (Count 5); IPAC ¶¶ 269–285 (Count 5). In response, FICO argues: (1) the Plaintiffs fail to allege monopoly power in a relevant market; and (2) do not plausibly allege anticompetitive conduct. R. 139, FICO Br. at 10–23.

Under Section 2 of the Sherman Act, monopoly power in a defined market must be sufficiently alleged for the Plaintiffs to survive a motion to dismiss. Section 2 of the Sherman Act makes it unlawful for anyone to "monopolize, or attempt to

monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce ....” 15 U.S.C. § 2. This section of the Sherman Act prohibits “the employment of unjustifiable means to gain that power” and requires “two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power ....” *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966).

### 1. Relevant Market

To successfully plead the first element of a Section 2 claim, the complaint must adequately set forth a relevant market. “A ‘relevant market’ under the Sherman Act is comprised of the ‘commodities reasonably interchangeable by consumers for the same purposes.’” *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 916–17 (7th Cir. 2020) (quoting *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)). Put another way, a relevant market is defined “by the reasonable interchangeability of the use or the cross-elasticity of demand between the product itself and substitutes for it.” *Sharif*, 950 F.3d at 918 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). “[W]here plaintiffs fail to identify any facts from which the court can infer that defendants had sufficient market power to have been able to create a monopoly, their § 2 claim may be properly dismissed.” *Endsley v. City of Chicago*, 230 F.3d 276, 282 (7th Cir. 2000).

Here, the Plaintiffs allege FICO holds more than a 90% market share in the B2B Credit Score Market. Specifically, according to Michael Pung, FICO’s former Chief Financial Officer and Executive Vice-President, FICO has “maintained a *90-*

9

*plus percent market share* for at least … 13 years." DPCC ¶ 66 (emphasis in original). This percentage allegedly has been confirmed by FICO, which states on its "About" page that FICO Scores are "the most widely used credit score" and used by "90% of top lenders." *Id.* ¶ 63. This percentage exceeds the percentage in comparable cases concerning market-share-based monopoly power for other Section 2 cases. *See, e.g.*, *Grinnell*, 384 U.S. at 571 (87% market share); *Am. Tobacco Co. v. United States*, 328 U.S. 781, 797 (1946) (holding that two-thirds of the market is a "substantial monopoly"); *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1107 (7th Cir. 1983) (70% to 80% market share); *Walter Kidde Portable Equip., Inc. v. Universal Sec. Instruments, Inc.*, 669 F. Supp. 2d 895, 902 (N.D. Ill. 2009) (holding that an alleged 65% market share is sufficient).

To resist that conclusion, FICO contends that (1) the Plaintiffs' market-share estimate is unsupported because there is no reliable source of market-share information; (2) the Plaintiffs have not plausibly alleged that FICO may control output or raise prices in the B2B market; and (3) each Credit Bureau has "substantial market power." FICO Br. at 10–12. These arguments fall short because FICO asks far too much of the Plaintiffs' pleadings. To be sure, "it is exceedingly difficult to prove market power, or monopoly power, directly, and the conventional way of proving power by showing a given share of a properly defined relevant market can present vexing problems as well." *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 397 (7th Cir. 2000). But the Plaintiffs easily meet their burden at the *pleading* stage. Not only do they cite FICO's own statements trumpeting its market share, the Plaintiffs draw on

academic research that concludes FICO "enjoys *a virtual monopoly* in the credit score market" and, as a result, "there has been limited innovation in scoring methodology." DPCC ¶ 67 (quotation omitted) (emphasis added). Given the pleading-stage standard, the Plaintiffs have adequately pleaded the first element of a Sherman Act Section 2 claim by properly alleging that FICO wields monopoly power in the relevant B2B market.

### 2. Anticompetitive Effects

Moving on to the next element, the Plaintiffs must also allege "the willful acquisition or maintenance" of monopoly power by FICO. In defining what constitutes "the willful acquisition or maintenance" of monopoly power, the Seventh Circuit has explained that "the conduct must harm the competitive *process* and thereby harm consumers." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 453 (7th Cir. 2020) (cleaned up) (emphasis in original), *cert. denied*, 141 S. Ct. 2877 (2021) ; *see NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135, (1998) (instructing that plaintiffs "must allege and prove harm, not just to a single competitor, but to the competitive process, i.e., to competition itself"). Because a Section 2 violation is "broader and less categorical in its definition of proscribed conduct" than a Section 1 claim, Areeda & Hovenkamp, *Antitrust Law* ¶ 777a, at 324, "a dominant firm's conduct may be susceptible to more than one court-defined category of anticompetitive conduct," *Viamedia*, 951 F.3d at 453.

Here, the Plaintiffs first argue that the No Equivalent Products, Dynamic Royalty Schedule, and Level Playing Field clauses are anticompetitive. Pls.' Resp. at 18–

11

20. Remember that FICO entered into separate agreements with the Credit Bureaus between 2013 and 2015. DPCC ¶ 105. Even so, these agreements were substantively similar with regard to the three clauses. *Id.* ¶¶ 106–08.

The Plaintiffs argue that the No Equivalent Products clause is anticompetitive for two reasons: (1) it prevents the Credit Bureaus from using any alternative credit scoring system that relies on similar analytics as FICO's analytic (otherwise known as the odds-to-score relationship), DPCC ¶¶ 109–15; and (2) it prevents the Credit Bureaus from using any alternative credit-scoring system that uses 20% or more of the reason codes used by FICO's scoring system. *Id.* For example, if VantageScore "used a 700 Score to indicate a less-than five-percent risk of credit delinquency, and if a 700 FICO Score also indicated the same risk of delinquency," the No Equivalent Products Clause would exclude the Credit Bureaus from using VantageScore. *Id.* ¶ 111. Similarly, if VantageScore used reason codes that "match[ed] 20% or more of the reason codes used by FICO scoring systems," the clause would prevent the Credit Bureaus from distributing it. *Id.*

The Plaintiffs also contend that the Dynamic Royalty Schedule clause is anticompetitive because it gives FICO the ability to control the prices of FICO Scores in an abusive and exploitative manner. DPCC ¶¶ 116–23. In the agreement between FICO and TransUnion, the clause provides that "once every twelve (12) months during the Term, Fair Isaac shall have the right to replace the Royalty Schedule by providing a new royalty schedule to TransUnion in writing." *Id.* ¶ 116.

Without diving into the Level Playing Field clause (which the Court discusses in further detail later), the No Equivalent Provision and the Dynamic Royalty Schedule clauses together qualify as sufficient allegations of anticompetitive effects. FICO's arguments to the contrary are unpersuasive. FICO contends that the No Equivalent Provision clause "prevent[s] licensees from copying FICO's intellectual property" and is thus procompetitive. FICO Br. at 17. But at least one Circuit has already held that FICO's competitors do not infringe on its purported credit score trademarks. *See Experian,* 650 F.3d at 1147. FICO further argues that the Dynamic Royalty Schedule clause has a legitimate business interest. This fails too. The Dynamic Royalty Schedule clause carries a stiff penalty for including a competitor's credit score to consumers: in the "Pre-Qualification" context, the lender pays *seven times* the rate if a FICO score is provided in connection with a non-FICO score. *Id.* ¶ 119. At the pleading stage, the Plaintiffs have alleged sufficient facts to proceed to discovery on the nature of these clauses' anticompetitive effects.

In addition to the three clauses, the Plaintiffs have plausibly alleged that FICO's Equifax Litigation was itself an anticompetitive act. Pls.' Resp. at 20–21.[4] In 2006, FICO filed a lawsuit against the Credit Bureaus and VantageScore "with the intended purpose of driving VantageScore Solutions out of business." DPCC ¶¶ 9, 88; IPAC ¶¶ 103–104. FICO alleged antitrust, trademark, false advertising, and trade

---

[4]The Plaintiffs further allege that FICO "waged a years-long campaign to disparage VantageScore Solutions" by criticizing the VantageScore credit scoring system. Pls.' Resp. at 21. Because the Plaintiffs have already plausibly alleged FICO engaged in anticompetitive conduct, the Court need not resolve this claim here.

secret claims. *See generally Fair Isaac Corp. v. Experian Info. Sols. Inc.*, 645 F. Supp. 2d 734, 738 (D. Minn. 2009). The district court granted summary judgement against FICO on the antitrust and false advertising claims, and a jury found FICO's purported trademark of the "300-850" FICO score range was merely descriptive. DPCC ¶ 92. The district court, in upholding the jury's verdict, noted that "[t]his extensive, expensive litigation seems to have been initiated largely *in response to a perceived threat to Fair Isaac's dominant position in the credit scoring industry.*" *Id.* ¶ 93 (quoting *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 711 F. Supp. 2d 991, 1000 (D. Minn. 2010) (emphasis added)). The Eighth Circuit eventually upheld the jury verdict and the earlier summary judgment ruling, both of which went against FICO. *Id.* ¶ 94 (citing *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139 (8th Cir. 2011)).

In response, FICO argues that the Plaintiffs' claims are time-barred under the four-year antitrust statute of limitations. FICO Br. at 13–14; *see* 15 U.S.C. § 15b. But "a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations." *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015). The Seventh Circuit has held that a "conceivable set of facts, consistent with the complaint, that would defeat a statute-of-limitations defense" is sufficient at the pleading stage. *Id.* Here, a conceivable set of facts exists in this case: FICO may have "affirmatively concealed the existence of … the anticompetitive contract provisions." Pls.' Resp. at 25. If true, then FICO's actions could qualify as fraudulent concealment, which requires that the defendant affirmatively concealed an offense and the plaintiff "neither knew nor, in the exercise of due diligence,

14

could reasonably have known of the offense." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194–95 (1997). So the limitations defense cannot be resolved at this pleading stage. That being said, FICO may seek leave to file an early summary judgment motion if discovery shows that there is no basis for the Plaintiffs' equitable-tolling and fraudu-lent-concealment claims.

The Plaintiffs also plausibly assert that the continuing-violations doctrine postponed the expiration of the limitations period. For the doctrine to apply, the Plaintiffs must challenge "not just one incident of [unlawful] conduct … but an un-lawful practice that continues into the limitations period." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380–81 (1982). Although the Equifax Litigation ended in 2011, the Plaintiffs have plausibly alleged the anticompetitive restrictions in the agreements between the Credit Bureaus and FICO continue to this day.

Finally, FICO argues that, under the *Noerr-Pennington* doctrine, it has im-munity under the antitrust laws because it sought redress against Equifax. *See* FICO Br. at 15 (citing *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993)). FICO contends that it has immunity because the Equifax Litigation was neither "groundless" nor "unreasonable." *Id.* But the Plaintiffs correctly point out that the *Noerr-Pennington* doctrine does not apply to false representations made to a government agency during the prosecution of a trademark application. *See, e.g.*, *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965). Given the earlier jury's finding that FICO made a knowingly false representation concerning its "300-850" trademark in its PTO application, *see* DPCC ¶ 92; IPAC ¶ 27,

FICO cannot claim refuge under *Noerr-Pennington* immunity at the pleading stage (and possibly later too). For these reasons, the Plaintiffs have plausibly alleged a Section 2 violation against FICO. FICO must file answers to the Complaints by October 23, 2023.

## B. Other Federal Claims

Next, the Plaintiffs argue that the Credit Bureaus, together and individually, conspired with FICO to prevent competitors to FICO Scores and allowed FICO "to penalize VantageScore sales in exchange for greater protection against competition from each other." Pls.' Resp. at 37; DPCC ¶¶ 168–238 (Counts 1–4); IPAC ¶¶ 194–268 (Counts 1–4). The Plaintiffs further assert that the Credit Bureaus aided FICO's monopolization by conspiring through a series of agreements to prevent competition in the B2B Credit Score Market. *See* Pls.' Resp. at 25–27; DPCC ¶¶ 254–271 (Count 6); IPAC ¶¶ 286–303 (Count 6). In response, FICO contends that the Plaintiffs fail to plead either a horizontal or a vertical Section 1 claim, or a Section 2 claim for conspiracy. FICO Br. at 25–36. Similarly, the Credit Bureaus deny the conspiracy claims, arguing that (1) the Plaintiffs have not plausibly alleged (1) "the required 'rim' linking the Bureaus to the claimed overarching scheme," CB Mot. at 2; (2) that each individual FICO-Credit Bureau agreement qualifies as an independent trust violation, *id.*; and (3) that the Bureaus acted with a specific intent to advance FICO's monopoly, *id.* at 3.

Section 1 of the Sherman Antitrust Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce

16

among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. Some restraints to businesses are unreasonable per se because they almost always tend to restrict competition. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018). Restraints that are unreasonable per se usually only include restraints "imposed by agreement between competitors," or horizontal restraints. *Id.* at 2283–84 (quoting *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988)). If a restraint is not per se unreasonable, then the next question is whether it violates the rule of reason. *Am. Express Co.*, 138 S. Ct. at 2284. The rule of reason may be violated by an agreement that has an adverse effect on competition in the relevant market. *See Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012); *see also Twombly*, 550 U.S. at 553 (explaining that § 1 of the Sherman Act only prohibits restraints on trade "effected by a contract, combination, or conspiracy" (cleaned up)).

The Plaintiffs first allege that FICO and the Credit Bureaus engaged in "a broader 'conspiracy' or 'combination' involving all Defendants to restrain trade" in violation of Section 1 of the Sherman Act. Pls.' Resp. at 37. For the Plaintiffs to adequately plead this claim, they must allege that the Defendants "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Marion Healthcare, LLC v. Becton Dickinson & Co.* (*Marion I*), 952 F.3d 832, 841 (7th Cir. 2020) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984)). Because FICO and the Credit Bureaus operate at "different levels of the distribution chain," the Plaintiffs must allege "similarly situated members of the conspiracy coordinated not only with the manufacturer, but also with each other" to allege a single

17

conspiracy. *Id.* at 841–42. Otherwise known as a "hub-and-spokes conspiracy," the Plaintiffs must allege that "there was a central coordinating party (the 'hub')" and "each participant (along the 'rim') recognized that it was part of the greater arrangement." *Id.* at 842. Put another way, "a hub-and-spokes conspiracy requires a rim connecting the various horizontal agreements." *Id.* (cleaned up).

Although the Plaintiffs do not explicitly use the term "hubs-and-spokes" conspiracy, their allegations are a substantive match: they allege that FICO (the hub) coordinated with each Credit Bureau (the spokes) to adopt anticompetitive agreements and undermine the Credit Bureaus' own joint venture, VantageScore, in exchange for protection against competition from each other and other potential entrants in the credit-bureau market—all in an effort to protect the FICO monopoly. *See* Pls.' Resp. at 37; DPCC ¶¶ 168–238; IPAC ¶¶ 194–268. Lacking direct allegations of an express agreement between the three Credit Bureaus themselves (that is, no direct allegations of a rim), the Plaintiffs ask the Court to rely on circumstantial evidence to infer the Credit Bureaus' coordinated actions. For support, the Plaintiffs allege that (1) the Credit Bureaus engaged in parallel conduct by agreeing to the same anticompetitive terms; (2) the No Equivalent Products, Dynamic Royalty Schedule, and Level Playing Field clauses are contrary to the Credit Bureaus' self-interest absent some greater objective; (3) the similar timing during which the Credit Bureaus entered into the agreements suggest the existence of a conspiracy; (4) the market structure for the B2B Credit Score Market suggests a conspiracy; and (5) the Credit

Bureaus had the opportunity and a reason to communicate about their common scheme. Pls.' Resp. at 39–49.

To be sure, the Plaintiffs do plausibly allege certain aspects of their conspiracy claims. For example, as described above, the No Equivalent Products and Dynamic Royalty Schedule clauses do appear to be contrary to the Credit Bureaus' self-interest, at least viewing the allegation in the Plaintiffs' favor. *See supra* IIIA. And as the Plaintiffs correctly point out, TransUnion explicitly stated that it signed the allegedly anticompetitive agreement after FICO reported "that TransUnion's two major competitors, Experian and Equifax, had already agreed to materially similar new contracts." TransUnion Counterclaims ¶ 43; *see* DPCC ¶ 107; IPAC ¶ 124. This raises the inference that the Credit Bureaus had knowledge of the contents of each other's agreements.

Even so, the major problem with the conspiracy claim remains the Plaintiffs' inability to plausibly allege that the Credit Bureaus conspired with each other. In *Marion I*, the Seventh Circuit held that the plaintiffs (healthcare companies), which purchased medical devices, failed to adequately allege a conspiracy between the distributors and manufacturer of the devices, as required for a hub-and-spoke conspiracy claim. 952 F.3d at 842. There, the plaintiffs could not allege any facts suggesting that the medical-device distributors were involved in inflating prices, coordinating among each other, or with the manufacturer. *Id*. Rather, the plaintiffs only alleged that the distributors were members of the conspiracy "because they buy and sell the devices according to the terms of contracts" that were negotiated in a "crooked fashion." *Id*.

19

So too here. The Plaintiffs principally argue that the Credit Bureaus engaged in a conspiracy on a *quid pro quo* basis: they would receive the beneficial Level Playing Field provision in exchange for adopting the anticompetitive No Equivalent Products and Dynamic Royalty Schedule clauses. But the premise that the Level Playing Field clause protected the Credit Bureaus from each other is flawed. In effect, the Level Playing Field clause forbids FICO from charging "any Credit Bureau a price that is lower than the price it charges any other Credit Bureau." DPCC ¶ 124. In other words, it is a "most favored nations"-type clause, which "are standard devices by which buyers try to bargain for low prices, by getting the seller to agree to treat them as favorably as any of their other customers." *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995), *as amended on denial of reh'g* (Oct. 13, 1995). The Seventh Circuit has held that most-favored-nations clauses are "not price-fixing." *Id.*; *see Associated Milk Dealers, Inc. v. Milk Drivers Union, Loc. 753, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 422 F.2d 546, 554 (7th Cir. 1970) (requiring "proof of predatory purpose as a prerequisite to finding that a most favored nation clause violates the antitrust laws").

The Plaintiffs have not adequately alleged that the Credit Bureaus adopted the Level Playing field with a predatory purpose. First, the Level Playing Field clause was agreed to before FICO filed the lawsuit against TransUnion in 2017. FICO entered a new contract with the Credit Bureaus containing the three clauses between 2013 and 2015. DPCC ¶ 105, IPAC ¶ 122. The allegation that the Credit Bureaus conspired with FICO in exchange for protection from competition, only to be sued by

20

FICO shortly after their agreement, is implausible (even giving the Plaintiffs the benefit of reasonable inferences). Second, the Plaintiffs' claims about protection from an outside competitor ring hollow. The Complaints do not allege that a new credit bureau was likely to emerge anyway, or that FICO took any steps to directly threaten the Credit Bureaus with helping new entrants. Third, the Credit Bureaus took significant measures to invest and to support VantageScores as a "competitively priced, highly predictive" alternative to FICO Scores. DPCC ¶¶ 6–7, 71–84, 88–94; IPAC ¶¶ 10, 87, 103–09. The face of the Complaints does not plausibly allege that the Credit Bureaus would sabotage their own joint venture to receive some protection from the wispy specter of external competition. In fact, the most recent litigation involving TransUnion suggests the opposite—that the Credit Breaus are emboldened to resist any pressure that FICO might try to exert on them.

Lacking a plausible allegation of a rim connecting the alleged conspiring Credit Bureaus, the Plaintiffs alternatively allege that FICO engaged in individual, vertical conspiracies with each Credit Bureau "in restraint of trade or commerce." Pls.' Resp. at 27. Yet the same rationale for rejecting the rimmed-conspiracy claim with all three Credit Bureaus applies to each single-bureau-conspiracy claim. Because the Level Playing Field provision is not plausibly a sufficient incentive for Credit Bureaus to conspire together, it is also not a sufficient incentive for each Credit Bureau to conspire separately with FICO. Put another way, the Plaintiffs are unable to adequately allege that the Level Playing Field was so lucrative for each Credit Bureau that they served to advance FICO's monopoly power. For example, shortly after the decision in

*Marion I*, the Seventh Circuit held that the plaintiff-healthcare companies' allegations of two vertical conspiracies were also "simply not plausible." *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.* (*Marion II*), 29 F.4th 337, 350 (7th Cir. 2022). There, the plaintiffs could not adequately allege that the vertical conspiracies "could plausibly influence the prices that the [plaintiffs] pay for the Products." *Id.*

Similarly, the Plaintiffs here also fail to adequately plead a claim for conspiracy to monopolize in violation of Section 2 of the Sherman Act. *See* Pls.' Resp. at 25. A crucial element of a Section 2 conspiracy claim is "the existence of specific intent to monopolize." *Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 540–41 (7th Cir. 1986). For the reasons explained earlier, the Plaintiffs have not adequately alleged the existence of specific intent. In fact, "the mere intention to exclude competition and to expand one's own business is not sufficient" for Section 2 purposes. *Id.*

In sum, then, the Plaintiffs' conspiracy claims against FICO and the Credit Bureaus are dismissed. For now, the dismissal is without prejudice given that the pleadings have faced only a first dismissal motion. But the Plaintiffs should realistically assess whether they can fill the gap in an amended pleading, bearing in mind that the Plaintiffs already gave it a fulsome shot in the current 300-plus-paragraph Complaints. If the Plaintiffs really believe that they can, then they must file their amended complaints by October 30, 2023.[5]

---

[5]This deadline is intentionally set for after FICO's answer deadline so that an answer is in place as discovery gets going with FICO.

22

### C. *Illinois Brick*

The Court next addresses whether *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), bars the Direct Purchaser Plaintiffs' federal claims. According to FICO, "all Plaintiffs[] are at best indirect purchasers." FICO Br. at 36. In *Illinois Brick*, the Supreme Court reaffirmed the distinction between "direct" and "indirect" purchasers in antitrust actions. 431 U.S. at 737–38. Aiming to prevent duplicative recovery, the Supreme Court held that only direct purchasers would be allowed to recover antitrust damages resulting from an overcharge by the defendant. *Id.* at 747. Allowing indirect purchasers to claim antitrust damages would pose the risk that the defendant would pay multiple times for the same conduct, and would threaten to mire antitrust litigation in nigh-impossible valuations of the damages allegedly suffered by each indirect purchaser. *Id.* at 746-47. In other words, "if manufacturer A sells to retailer B, and retailer B sells to consumer C, then C may not sue A. But B may sue A if A is an antitrust violator." *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1521 (2019). This doctrine has been applied in a variety of antitrust contexts. *See, e.g.*, *Kansas v. Utilicorp United Inc.*, 497 U.S. 199, 208 (1990) (applying the doctrine to regulated public utilities).

Here, the remaining Plaintiffs are direct purchasers. The Seventh Circuit addressed this issue in *Blue Cross & Blue Shield*, holding that a direct payment from a plaintiff to the defendant was the key element in deeming the plaintiff as the direct purchaser. *See* 65 F.3d at 1414. There, the insurer (yet another Blue Cross entity) sued a 21-office, physician-owned clinic that allegedly wielded monopoly power in

23

northern Wisconsin. *Id.* at 1408–09. The insureds (that is, the patients) received services on a fee-for-service basis, and Blue Cross paid the clinic "*directly* the portion of the fee that Blue Cross has agreed with its insureds to cover." *Id.* at 1414 (emphasis added). So too here. The Plaintiffs allege that the Direct Purchasers agreed to contracts that state they shall "pay the Credit Bureaus/Fair Isaac fees' for those products." DPPC ¶ 42. In response, FICO asserts that no Direct Purchaser "alleges that it pays FICO directly 'in the absence of an intermediary.'" R. 149, FICO Reply at 18 (quoting *Apple*, 139 S. Ct. at 1521. But FICO demands too much at the pleading stage. Generally, under *Illinois Brick* and *Apple*, the Plaintiffs can sue FICO and seek to recover damages as direct purchasers of FICO Scores but cannot (under federal law) claim damages stemming from an "overcharge" passed down a chain of distribution. *Apple*, 139 S. Ct. at 1525. Neither may the Plaintiffs allege that they have "[t]he right to sue middlemen that joined the conspiracy," *Paper Sys. Inc. v. Nippon Paper Indus. Co.,* 281 F.3d 629, 631–32 (7th Cir. 2002), because claims against the Credit Bureaus have been dismissed. Although the Plaintiffs do not explicitly allege that every payment goes from the Plaintiffs to FICO, the Plaintiffs have plausibly alleged that payments can be made directly to either the Credit Bureau *or FICO* in their Complaint. Therefore, *Illinois Brick* does not bar the Direct Purchasers from suing FICO.

### D. State Law Claims

Finally, the Plaintiffs bring suit under a variety of state antitrust laws. DPCC ¶¶ 272–321 (Counts 7 and 8); IPAC ¶¶ 304–67 (Counts 7–9). As a preliminary matter, because the alleged conduct that forms the basis for the state law claims as asserted

24

against the Credit Bureaus is the same as the conduct that fails to plausibly set forth a conspiracy with FICO, all of the state law claims against the Credit Bureaus fail on that basis too. Again, the Plaintiffs may reallege state law claims in any amended complaint if the Plaintiffs genuinely believe that those can be fixed too. As a second preliminary matter, any of the defense's arguments about state law antitrust claims against FICO that are parallel to the federal antitrust claim against FICO are rejected for the same reasons, as explained above. But the Defendants make a litany of other arguments addressing the remaining claims. *See* FICO Br. at 39–45. The Court addresses each argument in turn.

*Article III Standing*. FICO contends that the Plaintiffs do not have Article III standing in 25 States "where no Plaintiff does business." FICO Br. at 44–45. The Court rejects this argument. As the Court held in *Freeman v. MAM USA Corporation*, the whole point of a class action is to represent the interests of *class* members, as opposed to just the "representative's *own* interests." 528 F. Supp. 3d 849, 859 (N.D. Ill. 2021) (emphasis in original). The logical extent of FICO's claim that a plaintiff can only raise claims under her own State's laws would lead to no multi-state or nationwide class being certified absent a representative from every state. *Id.* No Supreme Court or Seventh Circuit precedent supports that outcome. To be sure, as noted in *Freeman*, the propriety of *certifying* a multi-state-law class action must be scrutinized very closely. *Id.* But a Rule 23 certification obstacle is not the same as an Article III standing deficiency. The key is that the Plaintiffs have standing to assert their own state law claims, which is enough.

25

*Intrastate nexus*. FICO next contends that the Plaintiffs' allegations are inadequate to assert claims under state law[6] that require a specific nexus between FICO's conduct and intrastate commerce. FICO Br. at 41. But the Plaintiffs have adequately alleged in their Complaints that "Defendants' conduct … had a substantial effect on the intrastate commerce of the states listed in counts Seven and Eight of [the] Complaint[s]." DPCC ¶ 32; IPAC ¶ 34. Because the Plaintiffs allege that FICO engaged in anticompetitive conduct that affected commerce in the States at issue, they readily pass the intrastate commerce requirement at the pleading stage.

*Class Actions*. FICO argues that certain States[7] prohibit class-action antitrust claims filed by indirect purchasers. FICO Br. at 41–42. First, as discussed above, the Direct Purchasers are exempted from that argument because the Plaintiffs have plausibly alleged that they paid FICO directly in their contracts. Second, because the Court has dismissed the conspiracy claims, those arguments are no longer relevant. Finally, although these States may prohibit class actions in state court, the Plaintiffs brought their claims in federal court. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 553 (N.D. Ill. 2019) (rejecting antitrust defendants' claim that plaintiffs are precluded from pursuing a class action under consumer protection statutes of various states).

---

[6]Specifically, District of Columbia, California, Massachusetts, Mississippi, Nevada, New Hampshire, New York, North Carolina, South Dakota, Tennessee, West Virginia, and Wisconsin. *See* FICO Br. at 41.

[7]Specifically, Arkansas, Illinois, Montana, and South Carolina.

26

*Tangibility*. FICO argues that credit scores are intangible services barred by Tennessee's antitrust statute. FICO Br. at 42. This contention fails. FICO provides no support for the notion that credit scores qualify as an intangible service. Even if they were, the Plaintiffs correctly respond that the credit scores at issue are included within a credit report, which serve as a tangible good. Pls.' Resp. at 67. So, FICO's credit scores are not exempt from Tennessee antitrust laws.

*Allegations*. FICO argues that the Plaintiffs must allege more than violations of antitrust laws or that FICO charged supracompetitive services in select States.[8] FICO Br. at 47. This argument too is incorrect. The Plaintiffs' claims are sufficient under each of the challenged state statutes. Because the Plaintiffs plead that FICO maintains a nationwide monopoly that harms the Plaintiffs in the States at issue, this suffices to plead an injury under their antitrust laws. *See e.g.*, *Sandee's Catering v. Agri Stats, Inc.*, 2020 WL 6273477, at *7 (N.D. Ill. Oct. 26, 2020) (holding that the plaintiff pleaded sufficient allegations under state antitrust laws); Pls.' Resp. at 68 (citing cases).

*Particularity*. FICO contends that the Plaintiffs fail to plead specific allegations of fraud or deception under Florida's and South Dakota's consumer-protection laws. FICO Br. at 42. That is incorrect. The Plaintiffs have sufficiently pleaded violations of those state laws: the Plaintiffs allege that FICO engaged in anticompetitive conduct on a nationwide basis, including in Florida and South Dakota. As the

---

[8]Specifically, Arkansas, New Mexico, Rhode Island, South Dakota, and West Virginia. FICO Br. at 42.

Plaintiffs rightly point out, their claims are based on antitrust violations under the Sherman Act, not on fraud, and need not satisfy Rule 9(b)'s particularity requirements. *See Sandee's Catering*, 2020 WL 6273477, at *10. Moreover, the Seventh Circuit has made clear that "[p]laintiffs need only plead facts, not legal theories, in their complaints." *Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 701 (7th Cir. 2014) (cleaned up).

*Market definition.* FICO also argues that certain States[9] exclude antitrust claims for items purchased primarily for business or commercial purposes, which include the B2B market. FICO Br. at 43. The Plaintiffs have the better argument. Hawaii and Montana statutes do not require a non-business purpose. *See* Haw. Rev. Stat. Ann. § 480-13(a); Mont. Code Ann. § 30-14-222. For Rhode Island or Missouri, the Plaintiffs' allegations are based on transactions that qualify as consumer transactions. *See* R.I. Gen. Laws § 6-13.1-5.2(a); Mo. Ann. Stat. § 407.025(1). This is not a defect in the state law claims.

*Bargaining disparity.* FICO argues that the Plaintiffs have not sufficiently alleged a level of "grossly unequal bargaining power," as required by New Mexico law. FICO Br. at 43. This is incorrect. A plaintiff properly states a claim under New Mexico law by pleading that the defendant either acted in a way that "(1) [took] advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or (2) result[ed] in a gross disparity between the value received by a person

---

[9]Specifically, Hawaii, Missouri, Montana, and Rhode Island. FICO Br. at 43.

and the price paid." N.M. Stat. § 57-12-2(E). Here, the Plaintiffs' allegations suffice, given the alleged exercise of monopoly power. *See In re Dealer Mgmt.*, 362 F. Supp. 3d at 557 (citing cases).

*Unconscionability.* FICO argues that certain States[10] require the Plaintiffs to allege a degree of unconscionability or egregious circumstances, which are absent in the Complaints. FICO Br. at 43. The Plaintiffs have the better argument again. The Plaintiffs may plead deceptive acts under the Arkansas and D.C. statutes. Ark. Code Ann. § 4-88-107(a); D.C. Code § 28-3904. Moreover, the Plaintiffs do sufficiently plead unconscionability to pass these bars, given the exercise of monopoly power alleged here. DPCC ¶¶ 308, 310; IPAC ¶¶ 341(b), 343(f).

*Statute of limitations.* FICO contend that Oregon's one-year statute of limitations renders the Plaintiffs' allegations untimely. FICO Br. at 43. But that argument fails too. First, as previously noted, the Seventh Circuit has held that "a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations." *Sidney*, 782 F.3d at 928. Moreover, the Defendants' acts plausibly qualify as a continuing violation, which extends the statute of limitations under Oregon law. *See Colquitt v. Mfrs. & Traders Tr. Co.*, 144 F. Supp. 3d 1219, 1228 (D. Or. 2015). For now, the Plaintiffs' claims are not barred by the Oregon statute.

*Indirect purchaser.* FICO argues that certain states[11] bar indirect purchasers. FICO Br. at 43–44. The Indirect Purchaser Plaintiffs have already withdrawn their

---

[10]Specifically, Arkansas, District of Columbia, and North Carolina. FICO Br. at 43.
[11]Specifically, Massachusetts, Missouri, and Rhode Island. FICO Br. at 43–44.

claim under Massachusetts law, Mass. G. L. c. 93(A). *See* IPAC ¶ 346. The Defendants' remaining arguments are not persuasive—other federal courts have allowed indirect purchaser claims under the state statutes at issue. *See In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 821 (N.D. Ill. 2017) (citing cases).

*Unjust Enrichment.* FICO argues that the Plaintiffs' unjust-enrichment claims fail. FICO Br. at 44. But the Indirect Purchaser Plaintiffs have properly alleged their unjust enrichment claims, mimicking the typically required elements of those state law claims. IPAC ¶¶ 363–67. Consequently, they are not barred by the state laws at issue.

## IV. Conclusion

The Court grants the Credit Bureaus' motion to dismiss in its entirety (all federal and state claims). As noted earlier, the Plaintiffs may file amended complaints by October 30, 2023, if there really is a fix for the problems identified in the Opinion. With regard to FICO's motion to dismiss, the Court grants the motion as to Counts 1 through 4, and Count 6, in both Complaints, but denies the motion as to Count 5 (the Section 2 claim against FICO only) and the state law claims against FICO. FICO must file answers to the Complaints by October 23, 2023. Rule 26(a)(1) disclosures shall be made by November 13, 2023. The parties shall file a joint status

report proposing other discovery, certification-motion, and dispositive-motions dead-lines on October 16, 2023. The status hearing of September 29, 2023, is reset to October 20, 2023, at 8:30 a.m. (but to track the case only, no appearance is required).

ENTERED:

_s/Edmond E. Chang_
Honorable Edmond E. Chang
United States District Judge

DATE: September 28, 2023

31